Good morning, Justices. My name is Bruce Goodman on behalf of the Plaintiff Appellant, and yes, I would like to reserve at least five minutes. All right. And in the course of reserving time, please be assured that we've read the law that you wish that we focus on. Okay. To begin my argument, we believe that this Court should reverse the verdict for the defendant because of the errors in the lower court. And I'd like to start out my argument by emphasizing to the Court that this was an issue that went to the jury only on the basis of informed consent. The first basis of our motion, the first error that we claim, is that the defendants in this case were allowed to introduce post-occurrence literature under the guise of causation. And admittedly, they were aware and agreed and the Court ruled it could not be used for standard of care issues, but that is in effect exactly how it was used. How was it used in that way? Pardon me? How was it used as a standard of care matter? Because my understanding is that Dr. was that an ophthalmologist would have to inform any patient that has an unusually large dilated pupil that she could encounter problems post-LASIK surgery. That's an excellent question. First of all, it wasn't and couldn't have been used for causation because the causation issue in this case is whether or not the surgery caused her problems, and that was undisputed. The defendants testified to that. Well, I'm not sure what you mean by that, but I will point out that the informed consent, the form that addressed the advising the patient that she might encounter problems said exactly that. Yes. And is that what you're relying on? No. The defendant didn't ignore that completely at their close. In their closing argument, which we've cited at page 8 of our reply, the defense argued at close that the plaintiff's large pupils put her at no risk at all, and there was no reason for the defendants to have measured plaintiff's dim light pupils or warned her that her large pupils put her at increased risk of injury. The biggest organization of ophthalmologists in the country, the American Academy of Ophthalmology, last year, 2007, dropped any recommendation that the dim light pupil size be measured for LASIK patients. That is clearly a standard of care argument. At the time of this occurrence, as you pointed out, the standard of care was to have measured and informed. Didn't Dr. Kraft concede that? Yes. But... Was the jury given any kind of an instruction with respect to this issue? The jury was not given any instruction. Why not? Why didn't you tend to a non-IPI that would cover your concern? Because then it is saying that it would, first of all, it was saying then it goes to causation. The causation was... Well, if you had given them an instruction that said it didn't, wouldn't that have solved the problem? No, because it wasn't allowed for, it wasn't relevant or material on any issue in this case. Any special interrogatories tendered either? No, there were not. What if the jury had concluded that in fact her pupils were measurements that were taken originally by the Kraft's office, as opposed to the later measurements, you know, eight or seven, seven or eight years later? There was no special interrogatory on that issue. No, but could, if the jury had concluded that she had, you know, within six, what's the... The normal was between... Three and six. Yes. And in really dark light, if they get to be eight or nine, that's considered large pupils. What if the jury concluded that her pupils were in fact within that three to six inch range? We don't know one way or the other, but if they had determined that, then wasn't the standard of care messed? The answer would be, but we don't know because... The answer would be yes? The answer would be if they concluded that her... Look, they either... Well, I was asking you a question. She either had the pupil size or she didn't. Right. They either, they could have missed the measure, whatever, but this gave the jury, because they, it lowered, effectively lowered the standard of care for the jury, and this gave the jury a reason to say, we don't care what the measurements were. You're speculating, though. You've got a general verdict. You don't know what the jury decided, do you? I am basing it, no, other than the jury verdict, but this... A general verdict. Yes. Without any kind of restrictions brought about by a special interrogatory, which you could have done. Yes. Okay. But the fact is that this wasn't relevant for either issue. It couldn't be used for cause, because the cause is whether or not she had the surgery and the surgery caused the problems. How do we draw... Mr. Goodman. Yes. How do we draw a line with post-event literature when the person or attorney proffering it indicates it's for this other reason? How do we have some bright line to say that it was really used to establish the standard of care? Well, they didn't use it as any basis of causation. They didn't use it for the proper reason. The only way it was used in this case is to... The way it was argued in the... As you pointed out in the closing? That's correct. That's the only time it ever, other than bringing it before the jury to say... Was there an objection made at the time of the argument? There was... It would have been a useless objection. We brought this before the court... Well, no. Hold on. Because, in fact, the evidence was admitted for purposes of causation and not for standard of care, and that was your understanding, and that's the court's ruling. And then if counsel goes beyond that ruling during the course of argument, then I think it warrants an objection to keep him within the constraints of the court's order. Two answers to that. Number one, we did this before the jury in Lemonade. We made the objections during the testimony at trial. We made a request to strike Dr. Schallhorn's testimony. And this was exactly the same as the court had already ruled upon that the jury could hear. And, as I read their briefs, there is no argument that we have waived any issue. Well, they're suggesting that your failure to request a limiting instruction amounted to a waiver, and they cite a case. The limiting instruction that they are saying is that this is relevant for causation, but the fact is... I know, but the point they're trying to make is that, in terms of a limiting instruction, it's one that you would have drafted. Now, the court might have rejected it, but at least you would have made your record. But the court had already ruled, was allowing it to come in, and that it would have served... All it would have done is to bootstrap it into admitting it for another admission. I understand your point that you really didn't want to highlight it in front of the jury. But you could have dealt with that with a special interrogatory, too. Of course, again, you run the risk of highlighting it. So, I mean, I was caught between the rulings of the court, which were repeated... That's life in the forest of law, counsel. And let me ask you another question regarding this, Mr. Goodman. I'm not sure, I'm not clear what your exact position is. Are you saying that Dr. Shelhorn's testimony regarding this post-occurrence literature should never have been admitted, or that it should have been admitted for proximate cause only? I believe it should never have been admitted for either way. It was irrelevant and immaterial to proximate cause. Well, let's say the proximate cause issue. I mean, that is a matter within the discretion of the trial court. She could have an opinion at odds with your opinion. That's true. And we have to give deference to the trial court's determination. Yes. And in order for us to say that that determination was irreversible error, we would have to conclude that the admission of this testimony resulted in substantial prejudice to your client, which leads us back to Justice McBride's point that how do we know how the jury decided? Because this gave... There was no question. There were admissions at trial by Dr. Kraft. There were admissions at trial, what the standard of care did. And now the jury is sitting here and assuming it's a closed case, any of these things can tip the balance. And now they are hearing specifically that you don't have to measure anymore, that there is not an association anymore. And that allows them to think why should we hold a doctor responsible today... For something that's no longer... That's no longer. But at the time it was required. Absolutely. There's no question about that. All right, Mr. Goodman, now you may want to spend a little more time on your second point. My second point is with regard to the... Foundations and the testimony that my client had medications, took medications that caused her pupils to become large. In the first instance, the doctors that testified, their sole basis for that conclusion was a review of some general text material. They themselves had no experience, they had no education, they had no training and had never been involved with a situation like this with one exception, and that was for one medication called Allegra D, which Dr. Kraft admittedly in his chart said that we believe that the plaintiff's problems are caused by large pupils, tried to discontinue the Allegra D. She did that and it turned out that it had no effect and Dr. Kraft ruled out the Allegra D. So all of the... The jury heard that. The jury heard that, okay? But these doctors concluded other medications for which they had no experience, background training, may have caused it. This is in the face of the fact... So why do you think that evidence was introduced to begin with? Because the defense knew essentially that they had no... that there were four doctors that had never diagnosed anything other than... Let me stop you right there. That may have been a bit of a rhetorical question because my point is that what we have before the jury is evidence, as Justice McBride pointed out, that these KEI employees did a measurement of the dilated pupil and the dilated pupil before surgery was never more than six and then we have Dr. Kraft who, in the course of demonstrating the videotape to the jury, testified that the videotape shows the dilated pupil being no more than six. Dr. Shellhorn also testifies similarly so we have that testimony on one hand and then we have the Ohio ophthalmologist are four of them on the other hand saying that her pupils at the time of trial dilated to eight or nine millimeters so here we have conflicting factual evidence and the question is how does Dr. Kraft explain that to the jury? Well, first of all I can go into those facts but I don't want to argue facts I want to argue the law here because there are other factors including the fact that they measured in normal light not in dim light they came out on their own records and there weren't any standards for the measurement They did no dim light measurement? Their chart says normal light and the records show that there weren't any standards by which they measured it at the time and the testimony that was undisputed is that the doctors in Ohio measured it under darker conditions than the doctors at KPI but be that as it may these, to give those opinions it has to be on more than guesstimate speculation and they had to have a basis and the court in this case I'm sorry the doctors in this case their sole basis was reading the test What did we do? We brought in the person that edited the test and he says the test just showed that there's a class of drugs for example We got the example in Let's go back to Justice Cahill's point Yes That was all before the jury and the jury had all that information I agree but the judge in this case has to be a gatekeeper I mean there's cases and cases where experts are disqualified based upon their opinion the substance the conjecture the speculation I'm going to ask you to reserve the balance of the time except I'm going to ask you to answer one question Sure and that concerns the point brought up by the defendant regarding what kind of specialists did you want for doctors who prescribe medication that these doctors are not allowed to testify as to the effect medication that they prescribed might have on the pupils of a patient That's a different question than what happened here These doctors didn't prescribe this medication No but shouldn't these doctors be aware of what medications have in terms of an impact on the patients they're treating Don't we expect that of our physicians Yes but this as it was testified to without any contra-testimony that this is a starting point you look to see can the class be a part of this and you look at that and every drug including Tylenol is in it and then you have to go to the specific drug in the family and the specific dosages and how much time None of that was ever done and it was every drug in the world is in this book and there was no foundation laid for that conclusion or that these particular drugs did in fact or could in fact cause the problem Thank you You'll have a chance Thank you Good morning your honors Karen DeGran for the defendants I'll begin by answering that question I was going to ask you to Thank you your honor My answer to that question is what is the purpose of these generic warnings if not to for a physician or a pharmacist or what have you to draw the conclusion that a specific drug may have that effect and the jury certainly heard Mr. Fischella's testimony that he didn't think that the text should be interpreted in that way and of course our witnesses thought otherwise and I will also comment that at the hearing on the post-trial motion the trial judge herself raised the question if not this expert just what you said Justice Garcia if not these physicians and in fact I do have a question for you because is there a difference in how you just answered Justice McBride's question you seem to qualify quite a number of words you said may these cautionary directions in prescriptions that may cause may cause may cause and is there a difference between a drug that testimony that a drug may cause and and the testimony elicited here that the drug that the enlarged pupil at the time of trial was in fact the result of this medication there's a difference in degree isn't there there's a difference in medical information if you will that had supported their testimony that taking the antidepressants caused enlarged pupils the testimony was based not just on these texts that were associated with Mr. Fischella but also Dr. Kraft testified at trial that after attending the pharmacist deposition he was he was flummoxed by his testimony and went right to the database that the pharmacist had identified at the deposition and came up with an article that didn't just associate a class of medication but the specific medication Zoloft with quite a bit larger than the quantity that the plaintiff presumably had I don't believe that that was the case and I believe that the testimony as to quantity that was given in front of the jury by Mr. Fischella was a question for the jury to resolve as to who was more credible and again going back to the trial judge all of these issues are issues within the trial judge's discretion as the court acknowledges What about Mr. Goodman's reading from the passage of the closing argument that suggests that the I mean how I'm going on to the first ruling that that was really not used for approximate cause but really to establish the standard of care that didn't require her being advised of this several years earlier I don't agree with that characterization your honor for a couple of reasons first if you consider the argument in the context of the closing argument that comment came as counsel was addressing the causation issue that was raised and framed by the plaintiff by the plaintiffs two experts that were not mentioned at all in the plaintiff's presentation Dr. Segal and Dr. Markowitz plaintiff framed this issue of causation by Dr. Markowitz at his evidence deposition which was completed and proceeded four months before the trial it wasn't a matter of I have this adverse ruling as the plaintiff argued in her reply now what am I going to do with it this was the plaintiff's theory going forward that causation specifically was related that her problem specifically was caused by this optic theory and that her night vision complaints in the years after her Lasik surgeries specifically were caused in that manner and that was Dr. Markowitz's testimony and that was Dr. Segal's testimony and it wasn't stated just in the context of the standard of care let me ask you regarding the standard of care and in the context of a lost chance case because doesn't the testimony that you just referenced that went to approximate cause doesn't it bleed over to standard of care when it's a lost chance case because as Justin McBride earlier in asking Mr. Goodman about that brought up the conclusion that the jury might reach that if it's no longer a belief held now by ophthalmologists that enlarged pupils can cause nighttime problems then where's the harm or why isn't that the standard of care that the jury might conclude really should apply? Well I don't think the jury would conclude that your honor because Dr. Schellhorn had testified that the standard of care at that point in time was we have to look at these folks and see if they have abnormally large pupils he conceded that over and over and over again in the address examination and then back when he was put on the stand at the end of the defense case after Dr. Schellhorn had testified Dr. Schellhorn also acknowledged the standard of care at the case that Dr. Schellhorn had testified at the trial. The testimony I think was overwhelming that they did. It comes to the issue that I think your honor raised at the beginning of the argument and that is the trial judge commented at the hearing and the post-trial motion wasn't the crux of the case this very issue that the court is raising now and that is pupil size because we can all go home if there is no enlarged pupil in 1998 and 1999 and we have let me just answer one thing and go ahead I haven't said anything I'm just waiting to you I'm doing something very difficult and I have a question that was raised what does normal mean in this medical record it shows in some of the record normal versus constricted normal means dim you can't measure dilated pupil unless that's correct we had three people come in and say here's how we do it we turn on just the light on the podium everything else is off the shades are down it's a dark room and we have as little light as we can so that's normal light and constricted means bright lights on and pupils zoom back down you can't get dilated pupils by medication for those purposes the other overwhelming thing was we had I don't know I've never had a medical malpractice case like this before we had these video tapes of the surgeries I sat down and watched them yesterday the jury watched them too didn't they sure did did you really tell on those the size of the case you have a very strong argument for the informed consent forms that she signed back in 1998 when this was experimental surgery and the FDA hadn't even approved it yet did you have consent to surgery forms which include she acknowledged at trial later that she had been warned that blindness or the loss of some vision that retinal detachment hemorrhage cataract formation even loss of an eye in the case I'd like to make that motion now I thought the crux of this is that the larger pupils was concerned was of cause greater concern for the result of this type of vision at night problem vision at night and starburst and everything else I'm using the right term I don't know I thought the point was that the thinking was at the time that if they were larger beyond the six there was a greater risk of the  possible problems relating to this that was the plaintiff's theory your honor and the plaintiff's theory I don't know that that's specifically in that I mean that was what Dr. Kraft's testimony was and there wasn't anyone else who quantified it if you had large pupils at least that was the thinking in 1998 and 1999 means okay you have to say you're at a slightly increased risk and that's really the whole case that's why I was surprised I didn't see a case from you cited when you have such a detailed informed consent form on experimental surgery the patient knows it's experimental knows the FDA hasn't approved it yet and the possible consequences run from everything from minor problems to blindness and they sign those forms and the plaintiff acknowledged how is the doctor ever going to expand and do research in medicine if they're going to get sued for every experimental case where they get informed consent well I think that's an interesting policy question well I was just wondering whether you had a case that said informed consent is an absolute defense of this kind of litigation I didn't cite one so I assume there isn't one but I can say that it would to some extent conflict with the standard of care that was in existence at the time because the standard of care required the ophthalmologist to inform any patient that had an extraordinarily large dilated pupil of the additional risk I don't know what they would be but apparently there are some well and that wasn't quantified or there wasn't very specific testimony on that by Dr. Siegel plaintiff's expert she was cross examined about the forms what she was aware of she was aware of it she acknowledged it she understood it and I think it was another one of many credibility questions pertaining to the plaintiff she gave self contradictory testimony she would tolerate no increased risk even though she understood the form said you might tolerate a very small increased risk of night vision complaint although it's an objective standard that testimony went in and the plaintiff's credibility was considered in conjunction with that I think that was probably quite favorable to the defense and the jury you did address the second issue that was raised if you would like to say more I don't think so I don't know who else you would get to be more qualified than these two physicians quite frankly and if there were somebody more qualified it wouldn't be a pharmacist so on that basis and for all the reasons that we set forth in the brief we would ask the court to affirm the judgment favor of the defense thank you counsel very briefly if I can address justice I can tell of the increased risk but all of that points out to the fact that we do have and there were some highly contested factual issues in this case as there are in every case which may not have experienced temporary problems for a couple of months not permanent problems and nothing at all about the increased risk zero and that's why Dr. McCarty  that there is no risk but this points out to the fact if all of these factual statements are true why do they need to bring in them all of these post occurrence literature to lower that standard of care why do they need to apply that she had large pupils which there was a picture that was unrefuted taken before this occurred that was measured and showed what her pupil size to be which was not commented on there's four doctors the defendant admits in their chart that she had large pupils and there was no basis for them to have concluded that without speculation and it was beyond their expertise to conclude that she in fact had the medication problem the medication problem again it was undisputed if you have medication problem your eyes are big and all like dim it's bigger than normal there's no evidence that ever occurred in this case and these doctors the text itself said that this class of family may possibly cause something the only explanation for that and it went unrebutted was that it can't be used to say somebody will have it you have to find the specific drug and dosage et cetera and there's no studies that supported that alright well thank you very much thank you